THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | 3:23-CR-62 |
| | : | (JUDGE MARIANI) |
| COREY L. THOMAS, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On March 21, 2023, a federal grand jury indicted Corey L. Thomas in a two-count

Indictment, charging him with being a felon in possession of a firearm (Count I) and

knowingly possessing a firearm with an obliterated serial number (Count II). (Doc. 1.) On

June 12, 2023, Defendant filed a Motion to Suppress Evidence and Dismiss Indictment

(Doc. 18). Defendant's motion arises out of a drug trafficking investigation at 1750 River

Road, Jenkins Township, in which Defendant was involved. (Doc. 36 at 3.) Defendant

argues that he was unlawfully detained and that all evidence seized subsequent to his

detention by police, including cash on his person and a gun in his car, must be suppressed.

(*Id.* at 2-4.)

The Court held an evidentiary hearing on Defendant's suppression motion on

November 16, 2023. (Hr. Tr., Doc. 32.) At the hearing, the Government presented the

testimony of two law enforcement witnesses: Detective Mark Stefanowicz and Detective

Daniel Mimnaugh. (*Id.*) Defendant did not present witness testimony at the hearing.

The parties have each filed post-hearing briefs (*see* Docs. 36, 37), and Defendant's motion to suppress is ripe for resolution. For the reasons set forth herein, the Court will deny the Motion to Suppress Evidence and Dismiss Indictment (Doc. 18).

## II. BACKGROUND

The testimony of Detectives Stefanowicz and Mimnaugh at the evidentiary hearing, in conjunction with the exhibits admitted at the hearing, provide the basis for the relevant factual background of Defendant's motion. Detective Mimnaugh, who was ultimately responsible for the stopping, engaging in a patdown, and arrest of Defendant, has extensive experience in law enforcement. Detective Mimnaugh was both a Luzerne County District Attorney Office detective and a member of the Luzerne County Drug Task Force. (*See* Hr. Tr. at 36:10-18.) At the time of this search and arrest, Detective Mimnaugh also held other law enforcement positions with various agencies, including the Pennsylvania State Police. (*Id*. at 36-39.) At the time of this incident, Detective Mimnaugh had roughly twenty-seven (27) years of narcotics experience. (*Id*. at 36-37.) Detective Mimnaugh has extensive training and experience in investigative techniques surrounding drug trafficking and had observed hundreds of drug trafficking transactions. (*Id*. at 38.)

On July 13, 2021, members of the Luzerne County Drug Task Force were conducting a drug trafficking investigation around a residence located at 1750 River Road, Jenkins Township, Pennsylvania ("the residence"). (*Id*. at 6.) The investigation previously began as a result of complaints of alleged narcotic activity at the residence. (*Id*.) Following

the initiation of the investigation, investigators began to rely on confidential informants to make controlled purchases of narcotics from Christopher Goggins, a man residing at the residence. (Hr. Tr. at 10.) During these purchases, Goggins would come out of the residence and meet the confidential informant at his car to sell narcotics. (*Id*. at 9-10.) Following this initial investigation, Detective Stefanowicz and other members of the Luzerne County Drug Task Force secured a search warrant to search the residence for evidence of drug trafficking. (*Id*. at 11-13.)

In anticipation of the expected search that would take place on July 13, 2021, Detective Mimnaugh began to surveil the residence at around 4:40pm. (*Id*. at 14-15.) As Detective Mimnaugh surveilled the residence in anticipation of the arrival of the search team, he witnessed a tan Grand Marquis with tinted windows pull into the driveway of the residence. (*Id*. at 39.) A man then proceeded to walk out the front door of the residence and got into the front passenger seat of the car. (Hr. Tr. at 40.) Detective Mimnaugh testified that, after roughly two minutes, the same man got out of the car and went back into the residence. (*Id*. at 40:3-10.) After the man got out of the car, the car proceeded to pull out of the driveway and leave the residence. (*Id*. at 40:11-17.)

Detective Mimnaugh testified that, based on his experience with drug trafficking investigations, he believed that he witnessed a drug related transaction.

> Q. If I could stop you right there. Is there a reason you decided to follow the vehicle?
> A. Yes. So the reason I followed the vehicle is because everything -- there's a couple reasons.

3

One reason was we were doing a search warrant on a house that we already knew was dealing drugs out of the house, dealing narcotics out of the residence.

Number two, a white male walking out of the residence, entering a vehicle, two minutes later exiting the vehicle and re-entering the residence, the driver never exited the vehicle, was indicative of illegal activity, some sort of narcotics activity at that residence.

So those were some of the reasons that I decided to follow the vehicle. It was very suspect that there was narcotics activity happening at that time.

(*Id*. at 40:18-41:7.)

Following his observation of this transaction, Detective Mimnaugh contacted Detective Stefanowicz to inform him as to what he had observed and to notify Stefanowicz that he was following the car that left the residence because he believed he had observed illegal activity. (*Id*.) Detective Stefanowicz testified that he was on his way with his team to search the residence when he initially spoke with Detective Mimnaugh. (*Id*. at 15-16.)

Detective Mimnaugh followed the car a short distance to a Dunkin Donuts located at 158 South River Street, Plains, Pennsylvania. (Hr. Tr. at 41.) Detective Mimnaugh testified that the car pulled into the Dunkin Donuts at approximately 4:52 in the afternoon. (*Id*. at 44.) The car proceeded to the right side of the Dunkin Donuts where the drive-through lane is located but did not order anything and continued to pull around the building. (*Id*. at 41.) Detective Mimnaugh then waited for the car to come around the building and initiated a stop. (*Id*.) Defendant immediately placed his car in park and placed both hands out of the driver's side window. (*Id*. at 42.)

Detective Mimnaugh asked Defendant to get out of his car. (Hr. Tr. at 42.) Defendant complied and was escorted by Detective Mimnaugh to his police vehicle, where Detective Mimnaugh pat searched Defendant for officer safety and felt a bulge in Defendant's front left pocket. (*Id*. at 42, 59.) Detective Mimnaugh then reached into Defendant's pocket and removed cash and placed it inside his vehicle. (*Id*. at 42, 59-90.) Detective Mimnaugh then stated his suspicions that Defendant had been involved in illegal activity and that he was being detained and was not under arrest at the time. (*Id*. at 45.) Detective Mimnaugh testified that, as this was happening, back-up officers arrived on scene at the Dunkin Donuts. (*Id*. at 47.)

When backup officers arrived at the Dunkin Donuts, Detective Mimnaugh called a member of the search team who was now conducting a search at the 1750 River Road residence. (Hr. Tr. at 42-43.) Earlier, as Detective Mimnaugh was following the car away from the 1750 River Road residence, Detective Stefanowicz and the search team were already *en route* to the residence. (*Id*. at 16-17, 40.) Once they arrived at the residence, Detective Stefanowicz immediately went to the second floor where he encountered Goggins. (*Id*. at 17.) Detective Stefanowicz identified himself to Goggins, who indicated that he knew who the officer was. (*Id*.) Goggins immediately stated, "did you stop the car that was out there?" (*Id*.) Detective Mimnaugh gave Goggins his *Miranda* warnings and asked him what he was talking about. (Doc. 32, Hr. Tr.) Goggins replied: "the car that was out there, I just gave that guy a gun and I gave him $600 cash." (*Id*.) Goggins continued to

describe the firearm he gave to Defendant. (*Id.*)

Detective Mimnaugh spoke with Officer Odgers, a member of the search team at the 1750 River Road residence. Officer Odgers told Detective Mimnaugh that Defendant was Goggins' drug supplier and that he had given Defendant $600 that Goggins owed Defendant for drugs and a gun when Defendant had shown up at Goggins' residence earlier. (*Id.* at 42-43.) During Detective Mimnaugh's conversation with Officer Odgers, Detective Mimnaugh also spoke with Detective Stefanowicz who asked whether Defendant was in possession of several five-dollar bills. (Hr. Tr. at 21, 43, 47.) Detective Stefanowicz advised Detective Mimnaugh that those bills may be the same serialized money used to purchase narcotics from the residence earlier in the day. (*Id.*) Detective Mimnaugh then looked at the wad of cash that he had previously removed from Defendant's pocket and observed that there were several five-dollar bills. (*Id.*)

Thomas was then arrested at the site of the Dunkin Donuts and transported to the Jenkins Township Police Department by backup officers. (*Id.* at 47-48.) Detective Mimnaugh remained with Defendant's car until Detective Stefanowicz obtained a state search warrant for the car. (*Id.* at 49.) During the search of Defendant's car, a Ruger .380 caliber firearm with an obliterated serial number was seized. (*Id.* at 50.)

### III. ANALYSIS

Defendant first alleges that law enforcement unlawfully detained Defendant without probable cause and seized his vehicle without obtaining a search warrant or arrest warrant.

(Doc. 36 at 1.) Second, Defendant contends that law enforcement unlawfully conducted a *Terry* frisk of Defendant when there was no indication that Defendant was armed or dangerous. (*Id*.) Third, Defendant argues that during the *Terry* frisk, Detective Mimnaugh unlawfully reached into Defendant's pocket and retrieved currency. (*Id*. at 1-2.) Defendant concludes by alleging that Defendant's stop, detention, and search and seizure of Defendant's person and car violated the Fourth and Fourteenth Amendments of the United States Constitution and Article I, Section I of the Constitution of the Commonwealth of Pennsylvania. (*Id*. at 2.) The Court addresses each of Defendant's arguments in turn.

**(A) Initial Detention of Defendant**

Defendant alleges that Detective Mimnaugh's blocking of Defendant's car and ordering him out of the car constituted an unlawful seizure. (*Id*. at 10-11.) Specifically, Defendant contends that the initial seizure of Defendant was "simply based on a suspicion that had no basis in fact or reality." (*Id*. at 11.) The Court disagrees.

The Fourth Amendment guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ... and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (West 2002).  As stated in *United States v. Butler*,

> [t]his provision limits government action in two related ways. First, it requires that the government conduct only reasonable searches and seizures. Second, it sets out (albeit at a high level of generality) the prerequisites that government officials must complete before executing a search or seizure, which include

7

obtaining a warrant. "The Supreme Court has read the Amendment's twin commands in tandem, holding that when people have a reasonable expectation of privacy in their persons or effects, all searches and seizures must be supported by a warrant, unless they fall into one of the exceptions to that requirement." *United States v. Hartwell,* 436 F.3d 174, 177 (3d Cir. 2006) (citing *Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

405 F. App'x 652, 655 (3d Cir. 2010). "What is reasonable depends upon all of the

circumstances surrounding the search or seizure and the nature of the search or seizure

itself." *United States v. Montoya de Hernandez,* 473 U.S. 531, 537 (1985).

As recently explained by the United States Supreme Court in *Kansas v. Glover*, 140

S. Ct. 1183 (2020):

[u]nder this Court's precedents, the Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); see also *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (quotation altered); *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

Because it is a "less demanding" standard, "reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The standard "depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act." *Navarette*, *supra*, at 402, 134 S.Ct. 1683 (quoting *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (emphasis added; internal quotation marks omitted)). Courts "cannot reasonably demand scientific certainty ... where none

exists." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Rather, they must permit officers to make "commonsense judgments and inferences about human behavior." *Ibid.*; see also *Navarette*, *supra*, at 403, 134 S.Ct. 1683 (noting that an officer " 'need not rule out the possibility of innocent conduct' ").

*Kansas*, 140 S. Ct. at 1187-88.

Stating that the Supreme Court "precedents . . . repeatedly affirmed that the ultimate

touchstone of the Fourth Amendment is reasonableness," the Court emphasized that "[t]he

standard takes into account the totality of the circumstances—the whole picture." *Id.* at

1191 (internal quotations and citations omitted). In *United States v. Nelson*, 284 F.3d 472

(3d Cir. 2002), the Third Circuit noted that:

> [t]he Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences . . . , personal observation of suspicious behavior . . . ,  information from sources that have proven to be reliable, and information from sources that—while unknown to the police—prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip.

284 F.3d at 478.

Under the exclusionary rule, "evidence obtained in violation of the Fourth

Amendment cannot be used in a criminal proceeding against the victim of the illegal search

and seizure." *United States v. Calandra,* 414 U.S. 338, 347 (1974). This prohibition also

applies "to the fruits of the illegally seized evidence." *Id.* The rule operates as "a judicially

created remedy designed to safeguard Fourth Amendment rights generally through its

deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at

348; *United States v. Leon,* 468 U.S. 897, 906 (1984).

In the present case, Defendant's contention that Detective Mimnaugh did not have reasonable suspicion to stop Defendant at Dunkin Donuts is without merit. During the suppression hearing, Detective Stefanowicz explained that the residence where Defendant was observed engaging in a suspected drug transaction was already being investigated for drug trafficking, including instances of drug transactions that were nearly identical to Defendant's alleged behavior at the residence:

> Q. So I want to talk to you, in regards to an investigation that was occurring in July of 2021. At that point in your career, who did you work for?
>
> A. I was -- in 2021, I worked for Hanover Township Police Department as a full-time narcotics officer, but I was assigned to the District Attorney's Office as a Street Narcotics Supervisor.
>
> Q. During that time frame, do you recall the investigation of a gentleman by the last name Goggins?
>
> A. Yes.
>
> Q. Would you give the Court background of how the investigation was initiated and what type of investigative techniques were used?
>
> A. Through uniformed officers with Hanover Township PD and complaints that would come into our department, Your Honor, we received complaints of suspicious narcotics activity and suspected narcotics trafficking coming from the residence of Mr. Goggins who lived on Oxford Street, Hanover Township, which is the jurisdiction of -- my main jurisdiction as a law enforcement officer. We then utilized a confidential informant and, also, using surveillance techniques started to make purchases of controlled substances from Mr. Goggins.
>
> Q. And how did those controlled purchases proceed? Basically, give me an outline, basically, of how it worked?

A. Basically, we would schedule a meeting with the confidential informant to come to Hanover Township Police Department, along with other members of my department or members of the Drug Task Force. We would photocopy buy money, the confidential informant would be searched, the vehicle, if they were utilizing one, would be searched prior to and after the investigation. We would then set up surveillance and then monitor the actions or activities that would take place touring [sic] the course of our operation. Now, the operation that took place in Hanover Township, Mr. Goggins left his residence and went down to what's known as Lee Park Avenue, which is at the intersection of Oxford Street and Lee Park, still within Hanover Township's jurisdiction, that's where our first transaction or our purchase of controlled substance off Mr. Goggins took place.

Q. You indicated there was surveillance that would be occurring during these controlled purchases?

A. Yes, in that area, we had a vehicle on Lee Park Avenue and we had another one on Luzerne Street, which is a one-way street. When Mr. Goggins came out of his residence and he made a left, that's a one-way street, and he walked right past my surveillance team down to Lee Park Avenue.

Q. Did there come a time when the investigation started to look at an address on River Road in Jenkins Township?

A. Yes, we attempted to contact Mr. Goggins several times and we also noticed there was no activity taking place at his Hanover Township address. Through investigation, we found that he had moved in with a female in Jenkins Township, and that's where he was asking us to meet him, if we wanted to purchase controlled substances off him.

Q. Do you recall the exact address?

A. 1780, 1750 River Road. It was -- I mean --

Q. I can refresh your recollection when we get to that point.

A. Okay.

Q. 1700 block of River Road?

A. Yes.

Q. And did any investigative occurrences or investigative steps, were they taken, in regards to that were any confidential informants used to purchase drugs from that particular location?

A. Yes, what we did is we moved our operations to Jenkins Township, where, again, we would meet with our informant, give them the buy money, and then we would set up surveillance at the residence in Jenkins Township. Across the street from the house in Jenkins Township, there was, I think, it was a type of garage or repair shop, that's where we would have one of our vehicles at and one further down the road, where we can monitor our confidential informant when they pulled in on the gravel road that leads to that residence.

Q. Can you describe to the Court how many controlled purchases you made out of that location, if you can recall?

A. I remember we made one on July 8, and then on the day of this incident, on July 13, we had made one earlier in the day.

Q. So to your recollection, there was, at least, two controlled purchases made from that particular location?

A. Yes.

Q. Can you describe to the Court how the operations went and what was observed during these particular controlled purchases?

A. Mr. Goggins would come out of his residence, meet with the confidential informant and do the transaction.

Q. How did the confidential informant get to the location? Did they drive to the location or --

A. They drove in their own -- I believe, they drove in their own vehicle. I don't believe we had an undercover cop with them. As best as I can recollect, they drove their own vehicle.

Q. Would they drive the vehicle onto the property and onto the driveway or alongside of it? How would that work?

A. It was a very long driveway off River Road. If I had to guess, I would say, it's probably 70 to 100 yards almost. It's a long driveway. So they would drive up to the residence, sit in the vehicle, then, Mr. Goggins would come out of the residence.

Q. Once he came out of the residence, what would happen?

A. Meet with the confidential informant and an exchange would occur for the controlled substance and then the buy money. And then the informant would leave, we would meet the informant a short distance from the scene to merely take possession of the controlled substance and if there was a return of any buy money. And, then, we would meet back at Hanover Township PD to de-brief the confidential informant and plus anything that any of the surveillance officers saw.

(*See* Hr. Tr., Doc. 32 at 6:9-11:2.)

Detective Stefanowicz also testified that Detective Mimnaugh would have been familiar with the investigation into the 1750 River Road residence prior to his encounter with Defendant:

Q. And would Mr. Mimnaugh have been familiar with, generally, the investigation?

A. Yes, being that he was the -- he was in charge of the office, when we would be doing search warrants, we would always contact him to brief him on what was actually transpiring, especially, when we were going to be doing search warrants or any type of buy-bust operations, where we were going to be calling people out for overtime and conducting operations. Normal buys, sometimes, we do not have to contact them, but these type of arrests operations, we would.

Q. So you would have de-briefed him, in regards to the progress of the investigation?

A. Yes.

(Hr. Tr. at 14:5-17.)

Indeed, Detective Mimnaugh testified that he was aware that the residence was the subject of an ongoing drug trafficking investigating, which was the reason behind why he was surveilling the residence ahead of the impending search of the residence:

> Q. So why don't you describe to the Court your part of the investigation for which we are here today.
>
> A. Okay. So there was a search warrant that was going to be served on 1750 River Road in Jenkins Township. So the search warrant was for narcotics. We had some narcotics buys, members of Luzerne County Drug Task Force had some narcotics buys out of this residence, and they were going to serve a search warrant at the residence.
>
> Prior to serving a search warrant, there were briefings at Jenkins Township Police Department. I explained to Mark Stefanowicz, Officer Stefanowicz, at the time, that I was going to go down to 1750 River Road and do pre-surveillance, prior to them getting to the residence and serving the warrant.

(Hr. Tr. at 39:9-21.)

As explained at the Court's suppression hearing, Detective Mimnaugh had extensive experience with observing and investigating drug transactions:

> Q. So during your career, did you have experience in investigating drug trafficking crimes?
>
> A. Yes, most of my career was engaged in gangs and narcotics.
>
> Q. Did you receive training, in regards to drug trafficking investigations?
>
> A. Many different trainings over the last 30 years, yes.
>
> Q. Prior to July of 2021, did you receive trainings?
>
> A. Yes, many.

Q. Would you describe to the Court what type of drug trafficking investigations you were involved with, prior to July of 2021?

A. So I've done everything from low-level street buys to my largest investigation was a RICO case that was signed by the Attorney General of The United States, out of New York City. So the case was out of New York City, but, obviously, it bled over to Pennsylvania lines, which made it a RICO case. It dealt with homicide and, you know, sex trafficking, drugs, narcotics, things like that. So Title 3 investigations, hard wires, you know, across the gamut.

Q. During your career, prior to July of 2021, did you have experience in using confidential informants?

A. Most of my career, yes.

Q. How about the use of controlled purchases of drugs?

A. Both controlled purchases and hand-to-hand purchases. I've done many.

(Hr. Tr. at 37.)

Detective Mimnaugh also described his personal observations of Defendant's car pulling into the driveway of the investigated residence and engage in what appeared to be a drug related transaction:

A. So at, approximately, 1640 hours, I arrived across the street from the residence of 1750 and just parked and conducted surveillance on that residence. At, approximately, 1646 hours, a tan Grand Marquis with blacked out windows, the windows were heavily tinted, pulled into the driveway of 1750 where we were going to serve the warrant.

I contacted Officer Stefanowicz, explained to him what was occurring. At the time that the Grand Marquis pulled up to the residence, a white male walked out of the residence of 1750, entered the passenger side door of the Grand Marquis, and for, approximately, two minutes. I could not see inside the car, again, the windows were tinted. Approximately, two minutes later, the white male exits the vehicle and re-enters the residence of 1750.

Again, during this time, I was keeping Officer Stefanowicz up to date with what was happening. So approximately – if that's 1646, approximately, 1647, 1648 the Grand Marquis was pulling out of the residence, pulling out of the driveway. I contacted Officer Stefanowicz, I let him know that I was going to follow the vehicle. The vehicle proceeded south on River Street –

Q. If I could stop you right there. Is there a reason you decided to follow the vehicle?

A. Yes. So the reason I followed the vehicle is because everything -- there's a couple reasons.

One reason was we were doing a search warrant on a house that we already knew was dealing drugs out of the house, dealing narcotics out of the residence.

Number two, a white male walking out of the residence entering a vehicle, two minutes later exiting the vehicle and re-entering the residence, the driver never exited the vehicle, was indicative of illegal activity, some sort of narcotics activity at that residence.

So those were some of the reasons that I decided to follow the vehicle. It was very suspect that there was narcotics activity happening at that time.

(Hr. Tr. at 39:22-41:7.)

The fact that the residence was currently being investigated for drug trafficking, paired with Detective Mimnaugh's personal observations of a drug transaction based on his decades of experience and training, gave rise to "a particularized and objective basis for suspecting [Defendant] of [engaging in] criminal activity." *Cortez*, 449 U.S. at 417-418. The Court finds that Detective Mimnaugh was also permitted to order Defendant to exit the vehicle. *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 2013) ("A police officer may order the driver of a lawfully stopped car to exit the vehicle.") (citing *Pennsylvania v. Mimms*,

434 U.S. 106, 111 (1977)). Therefore, the Court concludes that Detective Mimnaugh had an articulable and reasonable suspicion to stop Defendant's car and to initiate an investigative stop.

## (B) The *Terry* Frisk and Seizure of Cash

Defendant next argues that the search of Defendant's person was unlawful and without any reasonable suspicion. (Doc. 36 at 11-12.) Defendant also contends that Detective Mimnaugh's seizure of cash obtained during the *Terry* frisk was an unlawful seizure that exceeded the scope of the *Terry* frisk. (*Id*. at 13.) The Court addresses each argument in turn.

### *(i) Initiation of the* Terry *Search*

Defendant first alleges that Detective Mimnaugh had no basis to initiate a *Terry* frisk. (*Id*. at 11-12.) A police officer can conduct a limited protective search or frisk for weapons "where he has a reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27; *see Arizona v. Johnson*, 555 U.S. 323, 326 (2009) ("To justify a patdown of the driver or a passenger during a traffic stop,... the police must harbor a reasonable suspicion that the person subjected to the frisk is armed and dangerous."). Such an intrusion is only permissible when the officer can identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. When faced with an officer's protective search of an individual for weapons, the court must determine "whether the officer's action was justified

17

at its inception, and whether it was reasonably related in scope to the circumstances which justified the inference in the first place." *United States v. Pittman*, 338 F. App'x 147, 149 (3d Cir. 2009) (quoting *Terry*, 392 U.S. at 19-20).

"Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (quoting *Wardlow*, 528 U.S. at 123). To determine the constitutionality of a protective frisk for weapons, the court must look to the "totality of the circumstances – the whole picture" to assess whether the officer had an individualized and objective basis for his suspicion. *United States v. Gardner,* No. 12-217, 2013 WL 5918313, at *5 (W.D. Pa. Nov. 1, 2013) (citing *Cortez*, 449 U.S. at 417); *see also Pittman*, 338 F. App'x at 149 (noting that the court performs the "assessment objectively, focusing on whether the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate").

Many factors play into the determination of reasonable suspicion, including "location, history of crime in the area, a suspect's nervous or evasiveness and police officers' common sense judgments and inferences about behavior." *United States v. Connolly*, 349 F. App'x 754, 757 (3d Cir. 2009) (internal citations omitted); *see also United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2007) (noting that police officers can rely on their "knowledge, experience, and common sense judgments about human behavior" in the reasonable

suspicion determination).

Here, the Court finds that Detective Mimnaugh had reasonable suspicion to believe that Defendant may have been carrying a weapon on his person. Detective Mimnaugh testified that based on his extensive experience in the field of drug trafficking, it is a common occurrence for those engaged in drug transactions to have a weapon on them:

Q. Did you have experience in gun crimes, either, on their own or in relation to drug trafficking?

A. Yes, they kind of go hand in hand. I did a lot of gang work, which dealt with both gun crimes and narcotics.

. . . .

Q. When you patted him down, this was a *Terry* Frisk, right?

A. I would consider it one, yes.

Q. For officer safety?

A. Sure.

Q. And did you have any evidence or any kind of reasonable suspicion, at that time, that Mr. Thomas was armed and dangerous?

A. So here's how I'll answer that. In my mind, what I saw at the residence was narcotics activity with the Defendant. So when I see something like that, I'm always cautious about a weapon, because guns and narcotics go together all the time. So that's the threat, in my mind, from the totality of the circumstances from what I saw at the residence.

Q. I get that's based on your experience, but I'm asking you was there anything specific about Mr. Thomas that indicated to you that he was presently armed and dangerous?

A. Just what I saw at the residence.

(Hr. Tr. at 38:7-10; 58:8-25.)

Detective Mimnaugh personally observed Defendant pull into the residence that Detective Mimnaugh knew was under active investigation for drug trafficking activity. (*See* Hr. Tr. 39:11-40:17); *see also, e.g., Connolly*, 349 F. App'x at 757 (holding that "location [and] history of crime in the area" are relevant factors in considering whether there was reasonable suspicion.) Detective Mimnaugh also witnessed Defendant meet a person in his car for a brief period of time and leave. (*Id. at* 40:3-17.) As Detective Mimnaugh testified, in his experience, such activity is characteristic of a typical drug transaction. (*Id*. at 40:18-41:7.)

Based on these observations, paired with his extensive knowledge of drug related transactions, the Court finds that Detective Mimnaugh had a sufficient basis to form a reasonable suspicion that Defendant may have had a weapon on his person. *See Moorefield*, 111 F.3d at 13; *see also United States v. Yamba*, 596 F.3d 251 (3d Cir. 2007) (noting that an officer who "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous" may "conduct a carefully limited search of the outer clothing of such persons" (quoting *Terry*, 392 U.S. at 30)). Therefore, after assessing the "totality of the circumstances – the whole picture," *Gardner*, 2013 WL 591813, at *5, the Court concludes that Detective Mimnaugh had reasonable suspicion to conduct a *Terry* frisk of Defendant's person.

### (ii) The Scope of the Terry Search

Defendant also alleges that Detective Mimnaugh improperly seized and removed the wad of cash obtained during the *Terry* frisk. (Doc. 36 at 13.) Specifically, Defendant argues that "Detective Mimnaugh reaching into Mr. Thomas's pocket to retrieve currency, when he testified he believed it to be currency, is a direct violation of *Terry* and the Fourth Amendment." (*Id.* at 13.)

In *Minnesota v. Dickerson*, the Supreme Court held that "police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by *Terry*" "as long as the officers' search stays within the bounds marked by *Terry.*" 508 U.S. 366, 373 (1993); *see also United States v. Graves*, 877 F.3d 494, 499-500 (3d Cir. 2017) ("While the purpose of this limited search is not to discover evidence of crime, the Supreme Court has held that an officer may seize contraband detected during the lawful execution of such a search under the plain feel doctrine." (internal quotations omitted)).

When the Third Circuit applied *Dickerson's* plain feel doctrine, it held that to decide whether the scope of a protective search for weapons was proper, "the areas of focus should be whether the officer had probable cause to believe an object was contraband *before* he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk." *Yamba*, 506 F.3d at 259. The *Yamba* Court explained:

> Assuming that an officer is authorized to conduct a *Terry* search at all, he is authorized to assure himself that a suspect has no weapons. He is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the

object is a weapon. If, before that point, the officer develops probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search. If, indeed, he discovers contraband, the officer may seize it, and it will be admissible against the suspect.

*Id.*; *see also United States v. Johnson*, 452 F. App'x 219, 226 (3d Cir. 2011). The scope of a protective search must be limited to the outer clothing of the searched individual "'in an attempt to discover weapons which might be used to assault [the officer].'" *Graves*, 877 F.3d at 499 (quoting *United States v. Navedo*, 694 F.3d 164, 167 (3d Cir. 2007)).

Here, Detective Mimnaugh discovered the wad of cash "during a properly executed *Terry* search." *Johnson*, 452 F. App'x at 226 (citing *Yamba*, 506 F.3d at 259). Detective Mimnaugh had a reasonable, articulable suspicion that Defendant was armed and dangerous and he conducted a search of Defendant's person to ensure there were no weapons on him. Indeed, Detective Mimnaugh testified that he was concerned that the bulge might be a weapon, explaining:

Q. And did you have any evidence or any kind of reasonable suspicion, at that time, that Mr. Thomas was armed and dangerous?

A. So here's how I'll answer that. In my mind, what I saw at the residence was narcotics activity with the Defendant. So when I see something like that, I'm always cautious about a weapon, because guns and narcotics go together all the time. So that's the threat, in my mind, from the totality of the circumstances from what I saw at the residence.

. . . .

Q. And then you patted him down for a weapon?

A. Yes. For any weapon, yes.

Q. He had no weapon on him?

A. He did not.

Q. But you felt a bulge of money in his pocket?

A. I felt a bulge in his right front left pocket.

Q. And it felt like a weapon?

A. It felt like a bulge.

Q. You've been doing this 30 years, a lot of narcotics, you've felt a bulge of money before; right?

A. Many times.

Q. Money feels different than, especially, a bunch of five-dollar bills feels different than a gun.

A. I don't trust anything. I felt a bulge in his front left pocket, then I reached into his pocket, felt immediately that it was cash.

(Hr. Tr. at 58:12-20; 59:8-23.)

Detective Mimnaugh's testimony provides an adequate basis for the Court to find that he had reasonable suspicion to suspect that Defendant may have been armed and dangerous at the time of the stop. Detective Mimnaugh relied on his experience with drug trafficking and his personal observations at the 1750 River Road residence to conclude that there was a reasonable basis that Defendant may be armed and dangerous. *See Connolly*, 349 F. App'x at 757. The Court finds that Mimnaugh's search of Defendant's person for a weapon was initiated with reasonable suspicion that Defendant may be armed and dangerous and that Detective Mimnaugh was accordingly "authorized to assure himself that

[Defendant] ha[d] no weapons." *Yamba*, 506 F.3d at 259.

### *(iii) Seizing the Cash*

Defendant relatedly contends that it was improper for Detective Mimnaugh to

physically remove the cash from Defendant's person and place it in his police car following

the *Terry* frisk. (Doc. 36 at 13.) As the Court explained, *supra*, the Third Circuit has

described the scope by which an officer may search a person prior to concluding that they

are not armed:

> Since *Dickerson,* many courts have focused on exactly how "immediately" an
> officer must know that something felt during a *Terry* search is contraband or
> precisely how much a clothed object can be manipulated before a search
> becomes illegal. *See, e.g., United States v. Williams,* No. CRIM. RDB–05–
> 0240, 2005 WL 1902490, at *6 (D.Md. Aug. 9, 2005); *United States v. Ramirez,*
> No. 02 CR 1228(GEL), 2003 WL 260572, at *7 (S.D.N.Y. Feb.5, 2003) ("No
> doubt a metaphysician could draw distinctions between 'immediately' knowing
> something, knowing it after a 'second or two,' being 90% certain of something
> after running one's fingers across it, and knowing for certain after squeezing
> it."). And in the course of admitting in evidence certain contraband that was
> discovered in a *Terry* search, courts have credited testimony by some police
> officers that suggests remarkable sensory powers. *See, e.g., United States v.
> Ashley,* 37 F.3d 678, 681 (D.C.Cir.1994) (admitting in evidence contraband
> known "immediately" to be crack, despite the fact that it was found "inside two
> pair of pants, a pair of briefs, a paper bag, a paper napkin, and a plastic bag").
> Even the officer in this case testified—credibly, according to the District Court—
> that after feeling through a "middle medium weight jacket" for what "[p]robably
> wasn't even a half second," he nevertheless "could tell right away" that the lump
> in Yamba's pocket was marijuana.
>
> We reject a narrow focus on how quickly and certainly the nature of an object
> felt during a *Terry* search is known and on how much manipulation of a person's
> clothing is acceptable. In *Terry,* the Supreme Court authorized police officers
> to perform a routine pat-down search for weapons. Such searches necessarily
> involve a certain amount of "squeezing, sliding and otherwise manipulating" of
> a suspect's outer clothing, 508 U.S. at 378, 113 S.Ct. 2130, in an attempt to

discern whether weapons are hidden underneath. Thus, the problem with the officer's actions in *Dickerson* must be more than simply their occurrence. And a close reading of the case reveals what that "more" entails.

The Court in *Dickerson* clearly identified the object of a proper *Terry* search: weapons. *Id.* at 373, 113 S.Ct. 2130 (stating that a *Terry* search "must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." (internal quotation marks omitted)). The same sentence in *Dickerson* that identified "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket" as a problem also noted that the officer committed the offending conduct when he "already knew [the pocket] contained no weapon." *Id.* at 378, 113 S.Ct. 2130. The Court repeated the refrain in the next paragraph:

> Here, the officer's continued exploration of [the defendant's] pocket *after having concluded that it contained no weapon* was unrelated to the sole justification of the search under *Terry:* the protection of the police officer and others nearby. It therefore amounted to the sort of evidentiary search that *Terry* expressly refused to authorize and that we have condemned in subsequent cases.

*Id.* (emphasis added; brackets, ellipsis, internal quotation marks, and citations omitted).

The proper question under *Dickerson,* therefore, is not the immediacy and certainty with which an officer knows an object to be contraband or the amount of manipulation required to acquire that knowledge, but rather what the officer believes the object is by the time he concludes that it is not a weapon. That is, a *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be confiscated if spontaneously discovered during a properly executed *Terry* search. Moreover, when determining whether the scope of a particular *Terry* search was proper, the areas of focus should be whether the officer had probable cause to believe an object was contraband *before* he knew it not to be a weapon and whether he acquired that knowledge in a manner consistent with a routine frisk. *United States v. Jones,* 303 F.Supp.2d 702, 706 (D.Md.2004) (citing *Dickerson,* 508 U.S. at 376, 113 S.Ct. 2130; *Hicks,* 480 U.S. at 327, 107 S.Ct. 1149).

Assuming that an officer is authorized to conduct a *Terry* search at all, he is

authorized to assure himself that a suspect has no weapons. He is allowed to slide or manipulate an object in a suspect's pocket, consistent with a routine frisk, until the officer is able reasonably to eliminate the possibility that the object is a weapon. If, before that point, the officer develops probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search. If, indeed, he discovers contraband, the officer may seize it, and it will be admissible against the suspect. If, however, the officer "goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson,* 508 U.S. at 373, 113 S.Ct. 2130.

*Yamba*, 506 F.3d at 258-259.

Additionally, the Third Circuit has expressly affirmed an officer's ability to seize cash from a Defendant's person that may be evidence of criminal activity under the standard set out in *Yamba*:

The "plain feel" doctrine derives from plain view. Under plain feel, "officers may seize nonthreatening contraband detected during a protective patdown search." But like the plain view doctrine, the contraband must be "immediately apparent" to justify seizure under plain feel. Here, Corporal Dougherty's own testimony confirms that he did squeeze and manipulate Scott's pockets when detecting the cash. Thus, if "the officer[s] determined that the lump was contraband only after squeezing, sliding, and otherwise manipulating the contents of [Scott's] pocket—a pocket which the officer already knew contained no weapon," that would contradict any notion that they immediately recognized the lump as "a wad of cash," and the seizure would not be covered by the plain feel doctrine.

*United States v. Scott*, 777 F. App'x 54, 57 (3d Cir. 2019).[1]

Here, Detective Mimnaugh's hearing testimony offered a straightforward explanation

---

[1] Although the facts in *Scott* relate to seizing cash as evidence in the context of an alleged bank robbery, the Third Circuit's analysis in that case applies here, where a large quantity of cash found on Defendant's person following a suspected drug transaction is evidence of criminal activity.

as to why he seized the cash from Defendant's pocket. (Hr. Tr. at 59:21-23) ("I don't trust

anything. I felt a bulge in his front left pocket, then I reached into his pocket, felt immediately

that it was cash.") Therefore, there is sufficient credible testimony to show that Mimnaugh

seized the money before he knew that Defendant did not have a weapon on his person.

Further, Detective Mimnaugh had reasonable suspicion that the money may have been

related to the suspected drug transaction that he witnessed. Detective Mimnaugh testified

that because he witnessed a suspected drug transaction at a residence that was under

investigation for drug trafficking, he seized the cash:

> A. As I was patting the Defendant down, I felt a wad in his front left-hand pocket.
> I reached into his pocket, and it was a wad of cash. I pulled the cash out of his
> pocket, and I placed it on the trunk of my vehicle. I continued my pat-down.
> After I was down with my pat-down, I took the cash, put it on the driver's seat
> of my vehicle, because I didn't want it to, obviously, blow away or anything to
> happen to the currency.
>
> . . . .
>
> Q. On the second page, does it indicate what items were seized from the
> vehicle?
>
> A. Yes, on the second page, the items seized from the vehicle -- well, all these
> items were not seized, some of the items were seized from the Defendant. The
> 55 dollars in U.S. currency, and I have 'buy money' after that, is the 45 dollars
> and five-dollar bills and one ten-dollar bill, which coincided with the buy money
> from the narcotics purchase that morning. And, then, an additional 545 dollars
> in U.S. currency, which was the rest of the money taken out of the Defendant's
> pocket by myself, a Ruger .380 firearm with an obliterated serial number with
> magazine, a Samsung cellular phone and a -- Wilko cellular phone, and a wallet
> with various I.D.'s and Pocono Place registration.
>
> . . . .

Q. You removed that money from his person?

A. I did.

Q. And then you placed it inside your patrol vehicle?

A. So I placed it on the trunk first, and I finished my pat-down. And then I took it and placed it in the driver's side of my patrol vehicle, I didn't want it blowing away or getting lost, so I put it on the driver's side of my patrol vehicle.

Q. Mr. Thomas wasn't under arrest at this time, right?

A. No.

Q. There was no reason, at all, to take the money out of his pocket.

A. Well, in your mind, there wasn't, in my mind, there was narcotics activity that occurred at the residence, so for the time being, that's the reason I took it out of his pocket.

Q. You took that money because you believed it was related to narcotics activity?

A. Possibly.

Q. And then you said, I didn't seize it, I just took it and put it in my car, and if he was released, I would have gave it back to him; right?

A. Of course.

(Hr. Tr., Doc. 32 at 42:9-15; 50:4-17; 59:8-25.)

The above testimony, paired with Detective Mimnaugh's personal observations of a

Defendant engaging in a suspected drug trafficking transaction at a residence that was

under active investigation for such activity (*id*. at 39-40), provides ample evidence that

Detective Mimnaugh seized the cash because he believed the cash was evidence of illegal

narcotics activity. Detective Mimnaugh also stated that there was roughly "545 dollars in U.S. currency, which was the rest of the money taken out of the Defendant's pocket by myself." (Hr. Tr., Doc. 32 at 50:12-14.) Additionally, Detective Mimnaugh explained that even after feeling a bulge on the outside of Defendant's pants, he was still uncertain as to whether the bulge was a weapon, and "reached into [Defendant's] pocket, [where he *then*] immediately felt that it was cash." (Hr. Tr. at 59:21-23); *compare to Scott*, 777 F. App'x at 57 (holding that the seizure of cash from Defendant's pocket was unlawful because "the officer *already knew* [that the pocket] contained no weapon") (emphasis added). At the suppression hearing, Detective Mimnaugh explained that, immediately after feeling the cash, he knew that "there was narcotics activity that occurred at the residence, so for the time being, that's the reason I took it out of his pocket." (Hr. Tr. at 60:10-12.)

Given Detective Mimnaugh's extensive experience and training with respect to investigating drug trafficking, his personal observations of Defendant engaging in a suspected drug transaction at the residence under investigation, and his plain feel of a significant quantity of cash in Defendant's pocket, the Court finds that there is abundant evidence that Detective Mimnaugh had probable cause to seize the cash in Defendant's pocket as evidence of criminal activity. Based on Detective Mimnaugh's testimony of the search, the Court also concludes that the cash was "spontaneously discovered during a properly executed *Terry* search." *Yamba*, 506 F.3d at 259.

Defendant argues that Detective Mimnaugh did not seize the cash because he

believed that the cash was evidence of a crime, stating that "Detective Mimnaugh, 28 months later, now testifies he [took the cash and placed it in his police vehicle] to secure Mr. Thomas' money for Mr. Thomas' own good as if the money was somehow not secure inside his pocket." (Doc. 36 at 13.) This argument distorts the record testimony of Detective Mimnaugh and his explanations for seizing the cash. As the Court has referenced, *supra*, Detective Mimnaugh stated that he took the cash because "there was narcotics activity that occurred at the residence" where he initially surveilled Defendant's suspected drug transaction (Hr. Tr. at 42:9-15; 50:4-17; 59:8-25), and that he placed the cash in his police vehicle because he "didn't want it blowing away or getting lost." (*Id.* at 60:1-15.) These explanations for both Detective Mimnaugh's initial taking of the cash and placing of the cash in his police vehicle are not contradictory.

Additionally, given that Detective Mimnaugh testified that he was feeling Defendant's person for a weapon up until the moment he felt cash in Defendant's pocket (Hr. Tr. at 59:21-23), the Court finds that Detective Mimnaugh "had probable cause to believe an object was contraband before he knew it not to be a weapon and [...] acquired that knowledge in a manner consistent with a routine frisk." *Yamba*, 506 F.3d at 259.[2] In light of

---

[2] Based on Detective Mimnaugh's hearing testimony, his realization that the object in Defendant's pants was not a weapon and his determination that the object was cash occurred simultaneously to one another. Such a discovery of inculpatory evidence in the course of a regular *Terry* frisk is acceptable. *Yamba*, 506 F.3d at 259 ("[...] a *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be confiscated if spontaneously discovered during a properly executed *Terry* search.") Thus, because Detective Mimnaugh did not already determine that the object in Defendant's pocket was not a weapon *prior* to determining that the object was cash, Detective Mimnaugh was permitted to continue his frisk of Defendant up until the moment he determined that the object was cash.

Detective Mimnaugh's vast experience in investigating drug trafficking, paired with the

context behind his stopping of Defendant, the Court finds Detective Mimnaugh's explanation

for seizing the cash to meet the "plain feel" probable cause standard for seizing evidence in

the regular course of a *Terry* frisk. *See Scott*, 777 F. App'x at 56–57.

### (iv) Inevitable Discovery of Cash and Gun

Assuming, *arguendo*, that the Court concluded that there was not probable cause to

seize the cash from Defendant, or that seizure of the cash was otherwise improper, the

Court would nonetheless conclude that the cash and gun would have been discovered

through the "inevitable discovery doctrine." *See Nix v. Williams,* 467 U.S. 431, 443–444

(1984). The statements from Goggins regarding the cash and gun, paired with the

investigative evidence of the residence and Detective Mimnaugh's personal observations of

Defendant engaging in a suspected drug transaction, "establish[es] by a preponderance of

the evidence that the [evidence] ultimately or inevitably would have been discovered by

lawful means," *id.* at 444, as the Government would have had probable cause to search

Defendant and his vehicle based on this collection of evidence.

## (C) The Arrest

Defendant finally contends that, because the "unlawfully obtained currency and

information was used to establish probable cause to arrest Mr. Thomas and was then

placed in reports and affidavits in support of his charges and the search warrant for his

31

vehicle," all of the aforementioned evidence should be suppressed. (Doc. 36 at 13.)[3]

Because the Court has concluded, *supra*, that Detective Mimnaugh had reasonable suspicion to stop Defendant and conduct a *Terry* stop, as well as probable cause to seize the cash on Defendant's person, there is no basis to suppress evidence or dismiss the indictment on these grounds. Additionally, assuming *arguendo* that the Court found that the seizure of the cash from Defendant's person was improper and thus excluded such findings from the Affidavit of Probable Cause (Doc. 25-1), the affidavit as excised would contain sufficient evidence for the Court to conclude that there was probable cause to authorize the search warrant of Defendant's vehicle. Removing all references to the seized cash, the Affidavit of Probable Cause would have read:

> Your affiant is Narcotics officer Mark Stefanowics of the Hanover Township Police Department/Luzerne County Drug Task Force. Office Stefanowics has been employed as a full time law enforcement officer for the past thirty (30) years with the Hanover Township Police Department and assigned to the Luzerne County Drug Task Force for the past twenty-nine (29) years. Officer Stefanowics has received Drug Law Enforcement Training from Federal, State, Municipal and out of state agencies. Officer Stefanowics has been recognized and has testified as an Expert in Drug Law Enforcement in Federal and State court.
>
> On July 13, 2021 an operation was being conducted by the Luzerne County District Attorneys narcotics Unit, Luzerne County Drug Task Force and the Jenkins Township Police Department. A search warrant was to be served at 1750 River Road, Jenkins, Pa 18640. A Detective with the District Attorney's office was conducting surveillance on the target location prior to the serving of

---

[3] In his post-evidentiary hearing brief, Defendant's counsel stated that "[b]y Detective Mimnaugh's own admission there was no probable cause to stop, search, detain, or seize Mr. Thomas." (Doc. 37 at 11.) The Court understands that certain latitudes should be given to counsel in the course of their advocacy, but the aforementioned statement is a gross departure from Detective Mimnaugh's testimony. Counsel should accordingly refrain from making such statements in the future.

the search warrant. Said Detective contacted your affiant stating that a tan vehicle (vehicle in question) just arrived and that a subject exited the residence and entered the vehicle and approx. two (2) minutes later exited the vehicle and entered the target location of 1750 River Road, Jenkins Township, Pa. This location of 1750 River Road, Jenkins Twp was part of a Drug Task Force investigation in which sales of fentanyl were made.

The Detective has twenty-seven years of narcotics experience and what was observed is consistent with narcotics related transactions.

Your affiant was then informed that the raid team was enroute to the location and your affiant was informed that the tan vehicle (Mercury Grande Marquis) was starting to leave the location. The Detective informed your affiant that he was going to follow the vehicle.

The search warrant was served at the target location and the subject of the investigation, Christopher Goggin, informed your affiant that the guy (Corey) that just left he just gave approx. $600.00 in cash and also a firearm. The subject, Goggin, described the handgun as a Ruger .380 semi-automatic handgun, tan in color. When asked why did he gave "Corey" (Thomas) the gun, Goggin stated that Corey wanted one so he bought a gun off someone and gave it to Corey. Goggin stated that Thomas gets him dope (street term or heroin/fentanyl) and he paid him the money.

The Detective approached and detained the subject in a business parking lot in Plains Township. ~~U.S. currency was recovered from the subject, Thomas, which contained prerecorded buy money from an operation conducted on this date in which fentanyl was purchased from Goggin.~~

The subject, Goggin, was read and waived his Constitutional Rights prior to giving his statement to your affiant.

The operator/owner of the vehicle Corey Thomas is a person that is not allowed by Pa Law to possess a firearm. The subject was indicted in 2016 by the D.E.A. and pled guilty to a Felony charge Conspiracy to Distribute and Possession with the intent to distribute cocaine base and received 78 months sentence.

(*Id*. at 2-3.)

Upon reviewing the above-excised affidavit, the Court concludes that there was

probable cause to search Defendant's car even without references to the seized cash.

Therefore, Defendant's Motion to Suppress Evidence and Dismiss Indictment (Doc. 18) is

without merit.

## IV. CONCLUSION

For the reasons set forth herein, Defendant Corey L. Thomas's Motion to Suppress

Evidence and Dismiss Indictment (Doc. 18) will be denied. A separate Order follows.

Robert D. Mariani
United States District Judge